IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| ARIS BENJAMIN | : | Civil No. 1:13-CV-949 |
| RAMIREZ-ALVAREZ, | : | |
| | : | (Judge Kane) |
| **Plaintiff** | : | |
| | : | (Magistrate Judge Carlson) |
| v. | : | |
| | : | |
| CHRISTOPHER GEORGE, | : | |
| Deportation Officer, United States | : | |
| Immigration and Customs | : | |
| Enforcement Office, Depart of | : | |
| Homeland Security, et al., | : | |
| | : | |
| **Defendants** | : | |

## REPORT AND RECOMMENDATION

## I.    INTRODUCTION

Now pending before the Court is the defendants' motion to dismiss the plaintiff's Bivens[1] claims alleging that immigration officials violated his right to due process by falsely including in his immigration records that the plaintiff had admitted to being affiliated with a notorious Salvadoran prison gang, MS-13.  The defendants assert that the Court lacks jurisdiction over any claims brought against them in their official capacities, and they maintain that the Court should decline to find that the

_____

[1] Bivens v. Six Unknown Named Agents of Federal Bureau of Narcotics, 403 U.S. 388 (1971).

plaintiff has a <u>Bivens</u> action for due process violations that relate directly to the plaintiff's immigration proceedings.  In the alternative, the defendants insist that they are entitled to qualified immunity from the plaintiff's claims, since the plaintiff has not plausibly shown that the defendants violated a clearly established right by referring in paperwork to the plaintiff's claimed gang affiliation.  The motion has been fully briefed and is ripe for disposition.  For the reasons that follow, it will be recommended that the motion be granted.

## II.   BACKGROUND

### A.   Ramirez's Criminal History and Removal Proceedings

This lawsuit stems from criminal and immigration proceedings involving a Salvadoran citizen, Aris Benjamin Ramirez-Alvarez ("Ramirez"), and his repeated efforts either to return to the United States or to contest the United States government's countervailing efforts to have him returned to El Salvador because of Ramirez's multiple criminal convictions.

Ramirez first came to the United States in May 1981 as a child, and appears chiefly to have resided in or around Los Angeles, California since that time.  On May 6, 1989, Ramirez adjusted his immigration status to Lawful Permanent Resident.  However, nearly a decade later, in March 1999, Ramirez was placed into removal proceedings following his conviction for possession of a controlled substance.  On

July 14, 2000, an immigration judge order Ramirez removed *in absentia* pursuant to former section 241(a)(2)(B)(i) of the Immigration and Nationality Act, as amended ("INA"), 8 U.S.C. § 1231(a)(2)(B)(i).   Ramirez was removed to El Salvador on August 20, 2003, but illegally reentered the United States the following year on or about December 6, 2004.   A week later, Ramirez was convicted in the Northern District of Texas of illegal reentry, and was sentenced to 179 days in prison.   Upon completion of this sentence, and following some brief removal proceedings, Ramirez was again removed to El Salvador on November 7, 2005.

On or around January 4, 2007, Ramirez again attempted to re-enter the United States by falsely claiming to be a United States citizen.   He was paroled into the United States for prosecution, was convicted of being an Alien Unlawfully Found in the United States After Deportation, and was subsequently sentenced to 63 months in prison.   Following his service of this sentence, the Bureau of Immigration and Customs Enforcement ("ICE") took Ramirez into custody on September 30, 2011. Ramirez was detained at the York County Prison, where he was housed until he was transferred to the Pike County Correctional Facility on August 21, 2013.   Throughout this period, Ramirez was embroiled in protracted immigration proceedings during which he challenged ICE's efforts to have him removed to El Salvador, expressing a fear that he would face torture, persecution, or violence upon his return.

3

During his most recent removal proceedings, Ramirez was charged with two inadmissibility grounds: INA section 212(a)(7)(A)(i)(I), 8 U.S.C. § 1182(a)(7)(A)(i)(I) (applicant for admission not in possession of valid entry document), and INA section 212(a)(6)(C)(i), 8 U.S.C. § 1182(a)(6)(C)(i) (applicant seeking to procure admission through fraud or willful misrepresentation).   On December 12, 2011, ICE added new inadmissibility charges: INA section 212(a)(2)(A)(i)(I), 8 U.S.C. § 1182(a)(2)(A)(i)(I) (conviction of a crime involving moral turpitude (robbery)), and INA section 212 (a)(9)(A)(i), 8 U.S.C. § 1182(a)(9)(A)(i) (arriving alien previously removed).   On September 25, 2012, the immigration judge order Ramirez removed to El Salvador, but granted deferral of removal under the United Nations Convention Against Torture ("CAT") pursuant to 8 C.F.R. § 1208.17(a).   On October 18, 2012, ICE appealed the immigration judge's order to the Board of Immigration Appeals ("BIA)".

On February 12, 2013, the BIA remanded the case to the immigration judge for further proceedings.  (Doc. 34, Ex. A, Board Decision dated Feb. 12, 2013)  On April 12, 2013, the immigration judge re-affirmed his previous decision ordering Ramirez's removal and deferring such removal in accordance with the CAT.  (Doc. 34, Ex. B, Order and Opinion dated Apr. 12, 2013.)   On May 7, 2013, ICE appealed the immigration judge's new decision to the BIA.  (Doc. 34, Ex. C, Notice of Appeal,

4

May 7, 2013)  On September 27, 2013, the BIA dismissed ICE's appeal, but ordered that the record be remanded to the immigration judge to permit ICE "to complete or update identity, law enforcement, or security investigations or examinations, and further proceedings, if necessary, and for the entry of an order as provided by 8 C.F.R. § 1003.47(h)."  (Doc. 34, Ex. D, Board Decision dated Sept. 27, 2013)

**B.     Ramirez's Detention in ICE Custody**

The claims in this case appear to be based largely, and perhaps entirely, on Ramirez's claim that ICE officials wrongfully identified Ramirez has being affiliated with the MS-13 gang, something that Ramirez claims is not only untrue, but that caused Ramirez to be in significant danger as the result of this erroneous report. Ramirez claims not only that his safety was compromised as a result of being labeled as a former affiliate of the gang, but also that his detention pending ICE's appeal to the BIA was unnecessarily prolonged specifically because of this misinformation. Ramirez thus alleges that ICE officials intentionally included false information in Ramirez's records in order to ensure that immigration officials would keep Ramirez detained during the pendency of his immigration proceedings and the government's appeals.

Ramirez's claims regarding his prolonged detention appear first to begin in 2012, after the immigration judge ordered him removed but withheld his removal to

El Salvador.  In accordance with ICE policy, after the immigration judge issued his ruling, ICE reviewed Ramirez's continued detention in order to determine if he should be released pending resolution of ICE's appeal to the BIA.  (Doc. 34, Ex. E, ICE Memorandum entitled "Detention Policy Where an Immigration Judge has Granted Asylum and ICE has Appealed," dated February 9, 2004, and signed by then-ICE Secretary Michael J. Garcia) Pursuant to this policy, defendant George reviewed Ramirez's custody status and prepared a document entitled "Review for Release," which sets forth Ramirez's immigration and criminal history. (Compl., Ex. 5, Review for Release dated Oct. 22, 2012)

In this Review for Release, George provided the following summary of Ramirez's criminal convictions, arrests, and known associations:

> The subject has criminal convictions that include Possession of Cocaine, Illegal Entry, Receiving Stolen Property, Alien Unlawfully Found in the United States after Deportation, Resisting a Police Officer, and Armed Robbery.  The subject has also been arrested and charged with the following offenses for which the disposition is unknown or the charges were dismissed:  Assault with a Firearm; Murder; Threaten with the Intent to Terrorize; Possession with a Weapon at School; Burglary; Carrying a Loaded Firearm in Public Place; and Resisting Arrest.  It is also important to note that the subject has admitted in the past to being a member of the violent criminal street gang MS-13, in which he participated in several violent criminal acts.

On the basis of this criminal history, defendant George concluded that Ramirez

presented a risk of flight if he was released pending ICE's appeal to the BIA:

> The subject stated that he has no family ties in the United
> States, nor any ties to the community.  He has no equities
> in the United States or any significant reason to show that
> he would be able to comply with any conditions that ICE
> would set if he is released from custody.  Furthermore, the
> subject has demonstrated a history of non-compliance with
> law enforcement authorities, which is evidence by his
> conviction for Resisting a Police Officer.

In addition to presenting a risk of flight, defendant George concluded that Ramirez

would constitute a danger to the community if he were released:

> The subject is a serious danger to the community given his
> history of armed and violent criminal offenses.  He has
> further admitted to participating in criminal activity with
> the violent street gang MS-13, and given the tattoos that
> are all over his body, he would easily be able reintegrate
> [sic] himself in the gang.

Furthermore, defendant George observed the following:

> The subject's criminal history demonstrates that he is prone
> to violent behavior and is unwilling to abide by the laws of
> the United States.  The subject claims that at one time he
> was an active MS-13 gang member, in which he
> participated in several violent criminal acts for which he
> was never arrested or charged with [sic].  The subject
> claims to have abandoned his former life as a gang member
> and stated that he is no longer affiliated or involved in the
> gangs.  This claim was also a key factor in the IJ's decision
> to grant deferral of removal under CAT; however, this
> officer finds these claims to be incredulous [sic] due to the

7

> fact that on numerous interviews with the subject he has
> offered up information relating to gang activity inside the
> York County Prison.  If the subject is no longer associated
> with any gangs, it is extremely unlikely that he would be so
> intimately involved and knowledgeable of the inner
> workings of the gang structures in the York County Prison,
> as it is typical that once a member chooses [sic] to leave
> the gang they are no longer privy to access.  At a minimum,
> the subject's claims should be considered suspect given his
> history of false claims to law enforcement officials and his
> prior gang activity.

On the basis of this review, defendant George recommended that Ramirez be kept in

custody pending ICE's appeal of the immigration judge's decision to the BIA:

> As previously stated, the subject has been convicted of
> Armed Robbery and has committed several other violent
> crimes that he has not been held accountable for.  His
> criminal history clearly shows his propensity for violating
> the laws of the United States and he is a clear danger to the
> community.  Based on the aforementioned information, it
> is recommended that the subject remain in custody pending
> the outcome of the appeal.

Defendant   George's   recommendation   was   forwarded,   along   with   brief

recommendations from two other officers that also urged continuing detention on the

basis of Ramirez's risk of flight and potential danger to the community.

On the basis of these recommendations, On October 25, 2012, defendant

Decker decided to keep Ramirez in custody, and wrote "Mand. Detention!

Criminal/gang member cont. detention pending appeal."  In his official Decision to

Continue Detention, (Compl., Ex. 1), defendant Decker informed Ramirez that ICE

had reviewed its custody determination and made the decision to continue his custody

pending appeal.  Defendant Decker wrote:

> You have criminal convictions that include Possession of
> Cocaine, Illegal Entry, Alien Unlawfully Found in the
> United States after Deportation, Resisting a Police Officer,
> and Armed Robbery.  Your criminal history demonstrates
> you are a potential danger to the community.  It is also
> important to note that you have admitted in the past to
> being a member of the violent criminal street gang MS-13.
>
> In addition the IJ's September 25, 2012, Grant of Deferral
> of Removal may be overturned on appeal.  If the appeal is
> successful, ICE believes it is unlikely that you would
> voluntarily surrender for removal.

Ramirez was served with a copy of the ICE document entitled "Decision to Continue

Detention" on November 2, 2012.  (Compl., Ex. 1.)  Ramirez alleges that defendant

Decker's decision contains a number of false statements, including the allegation that

Ramirez had previously admitted to being member of MS-13.   (Compl., ¶ 10.)

According to the complaint, approximately two weeks after notifying Ramirez about

the basis for his continued custody, the defendants repeated their false allegation

about his past gang affiliation, in order to support their decision to continue his

custody.   Ramirez alleges that this decision and accompanying false statements

caused him severe mental harm by increasing his post-traumatic symptoms that had

previously been diagnosed as Anxiety Disorder by Anne Middaugh, Ph.D., a clinical psychologist.[2]  (Compl., Ex. 3, Statement of Dr. Middaugh, dated May 17, 2012)  Although Dr. Middaugh's statement is incomplete, she observes that Ramirez had lived in "gang areas of Los Angeles," has tattoos that are "indicative of gang affiliation," and that Ramirez had "acknowledge[d] that, due to his living circumstances and community, he has friends and 'hung out' with many individuals who were gang members." (Id., Ex. 3 ¶ 15.)

On November 3, 2012, Ramirez sent a letter regarding ICE's decision to continue his detention to four offices, including: the Office of Internal Affairs/Intake Group; the Department of Homeland Security, Office of Inspector General; the American Bar Association Commission on Immigration; and the Office of Enforcement and Removal Operations, DHS/ICE.  (Compl. ¶ 11, Ex. 4, Letter dated Nov. 3, 2012)  In this letter, Ramirez requested that the statement included in ICE's decision to continue his detention regarding his alleged prior admission to being a member of MS-13 be corrected.  (Id.)  Although Ramirez conceded that he had "admitted in the past to being a member of a gang," (id.), he maintains that he did not

---

[2]  Notably, Dr. Middaugh's statement that Ramirez attached to the complaint is missing Dr. Middaugh's summary and conclusions, and is also missing her actual diagnosis of Ramirez.  (Id.)

admit to being a member of MS-13.  (<u>Id.</u>)  Ramirez never received a response to this letter.  (<u>Id.</u>)

According to the complaint, Ramirez later became aware of another ICE document that he claims was drafted prior to ICE issuing the Decision to Continue Detention, in which defendant George made substantially the same false claim regarding Ramirez's gang affiliation.  (Id. ¶ 12, Ex. 5, Review for Release dated Oct. 25, 2012)  All four of the named defendants signed the Review for Release.  (<u>Id.</u>)

Ramirez commenced this litigation on April 15, 2013.  (Doc. 1)  On October 31, 2013, the defendants filed the motion to dismiss that is currently pending before the court.  (Doc. 33)  The parties have fully briefed the motion.  (Docs. 34, 35, 36, 37, 38)

On October 9, 2013, the immigration judge once again ruled that Ramirez was removable from the United States, but deferred his removal to El Salvador pursuant to the CAT.  ICE declined to appeal this ruling to the BIA, and the immigration judge's ruling, therefore, became a final order.  By letter dated January 14, 2014, Ramirez notified the Court that he had been released from ICE custody and is now living in Los Angeles.

### III.   STANDARDS OF REVIEW

#### A.   Rule 12(b)(1) of the Federal Rules of Civil Procedure

Pursuant to Rule 12(b)(1) of the Federal Rules of Civil Procedure, a district court must dismiss a complaint if the Court lacks subject matter jurisdiction to consider the claims.  A defendant may move to dismiss pursuant to Rule 12(b)(1) by bringing a facial or factual attack on the complaint.  See Gould Elec. Inc. v. United States, 220 F.3d 169, 178 (3d Cir. 2000); Mortensen v. First Fed. Sav. & Loan Ass'n, 549 F.2d 884, 891 (3d Cir. 1977).  In this case, the defendants are bringing a facial challenge to the complaint, which is a challenge to the sufficiency of the pleadings, and requires the Court to consider the allegations and the documents referred to in the complaint in the light most favorable to the plaintiff.  Gould Elec. Inc., 220 F.3d at 176.  Where, as here, a defendant challenges the Court's subject matter jurisdiction under Rule 12(b)(1), the plaintiff bears the burden of persuasion to show that the matter is properly before the Court.  See Kehr Packages, Inc. v. Fidelcor, Inc., 926 F.2d 1406, 1409 (3d Cir. 1991).

#### B.   Rule 12(b)(6) of the Federal Rules of Civil Procedure

The defendants have also moved to dismiss the complaint pursuant to Rule 12(b)(6) of the Federal Rules of Civil Procedure on the grounds that the complaint fails to state a claim upon which relief can be granted.  The moving party bears the

burden of showing that no claim has been stated, Hedges v. United States, 404 F.3d 744, 750 (3d Cir.2005), and dismissal is appropriate only if, accepting all of the facts alleged in the complaint as true, the plaintiff has failed to plead "enough facts to state a claim to relief that is plausible on its face," Bell Atlantic Corp. v. Twombly, 550 U.S. 544, 570 (2007) (abrogating "no set of facts" language found in Conley v. Gibson, 355 U.S. 41, 45–46 (1957) ).  The facts alleged must be sufficient to "raise a right to relief above the speculative level."  Twombly, 550 U.S. 544, 555. This requirement "calls for enough fact[s] to raise a reasonable expectation that discovery will reveal evidence" of the necessary elements of the plaintiff's cause of action. Id. at 556.  Furthermore, in order to satisfy federal pleading requirements, the plaintiff must "provide the grounds of his entitlement to relief," which "requires more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do."  Phillips v. County of Allegheny, 515 F.3d 224, 231 (3d Cir.2008) (brackets and quotations marks omitted) (quoting Twombly, 550 U.S. 544, 555).

In considering a motion to dismiss, the court generally relies on the complaint, attached exhibits, and matters of public record.  Sands v. McCormick, 502 F.3d 263, 268 (3d Cir.2007).  The court may also consider "undisputedly authentic document[s] that a defendant attaches as an exhibit to a motion to dismiss if the plaintiff's claims are based on the [attached] documents."  Pension Benefit Guar. Corp. v. White

Consol. Indus., 998 F.2d 1192, 1196 (3d Cir.1993).  Moreover, "documents whose contents are alleged in the complaint and whose authenticity no party questions, but which are not physically attached to the pleading, may be considered." Pryor v. Nat'l Collegiate Athletic Ass'n, 288 F.3d 548, 560 (3d Cir.2002); see also U.S. Express Lines, Ltd. v. Higgins, 281 F.3d 383, 388 (3d Cir. 2002) (holding that "[a]lthough a district court may not consider matters extraneous to the pleadings, a document integral to or explicitly relied upon in the complaint may be considered without converting the motion to dismiss into one for summary judgment.").  However, the court may not rely on other parts of the record in determining a motion to dismiss. Jordan v. Fox, Rothschild, O'Brien & Frankel, 20 F.3d 1250, 1261 (3d Cir.1994).

## IV.   DISCUSSION

### A.    Official Capacity Claims Must Be Dismissed

As a threshold matter, the defendants argue that principles of sovereign immunity bar any claims brought against them in their official capacities, and, therefore, these claims must be dismissed because the Court lacks jurisdiction over them.  The complaint does suggest that Ramirez is endeavoring to sue all four named defendants in their official and individual capacities, (Compl., ¶¶ 6-9), and he bases his assertion that jurisdiction lies over such claims pursuant to 28 U.S.C. § 1331, which vests federal courts with subject matter jurisdiction over causes of action

14

"arising under the Constitution, laws, or treaties of the United States."  (Id., ¶ 2.) However, nothing in this jurisdictional statute waives the United States' sovereign immunity from suit, and the United States and its officials sued in their official capacities are immune from Ramirez's claims based upon well-settled legal principles.

"Absent a waiver, sovereign immunity shields the Federal Government and its agencies from suit." F.D.I.C. v. Meyer, 510 U.S. 471, 475 (1994).  Sovereign immunity is jurisdictional in nature. Id. Because suits against a federal agency or a federal employee sued in his official capacity are in effect actions against the United States, Correctional Services Corp. v. Malesko, 534 U.S. 61, 72 (2001); Lewal v. Ali, 289 F. App'x 515, 516 (3d Cir. 2008), they are barred by principles of sovereign immunity absent an explicit waiver. Id.; see also Robinson v. Overseas Military Sales Corp., 21 F.3d 502, 510 (2d Cir. 1994) ("Because an action against a federal agency or federal officers in their officials capacities is essentially a suit against the United States, such suits are also barred under the doctrine of sovereign immunity, unless such immunity is waived.").  Ramirez offers nothing to contradict these well-settled principles of law, and the United States has not waived its immunity from suit. Accordingly, we will recommend that the district court dismiss any official-capacity claims that Ramirez may be pursuing in this action.

**B.    Because the Plaintiff's Proposed <u>Bivens</u> Claims Relate Directly to His Detention by Immigration Officials Pending Ongoing Removal Proceedings, and Because the Plaintiff Had Other Legal Means of Obtaining Relief Through Those Immigration Proceedings, the Court Should Decline to Imply a <u>Bivens</u> Remedy to the Claims in the Specific Factual Context Presented Here**

Next, the defendants urge the Court to dismiss Ramirez's <u>Bivens</u> claims against the individual defendants.  The defendants maintain that the Court should decline to "imply" a <u>Bivens</u> remedy against the individual defendants in this particular type of case, involving the detention of an alien subject to removal proceedings, because either there exist alternative processes for protecting the constitutional interests at issue, or because other factors counsel hesitation against implying a <u>Bivens</u> remedy in this case.  Notably, the defendants do not argue that a <u>Bivens</u> remedy is never available in cases involving allegations of Fifth and Eighth Amendment violations, but they instead argue that review of such constitutional harms in the specific immigration context presented in this case is inappropriate under <u>Bivens</u> and applicable precedent.

In <u>Bivens</u>, the Supreme Court held that the victim of a Fourth Amendment violation by federal officers had a claim for damages even in the absence of a statute providing such a cause of action, and the Court subsequently has recognized that non-statutory <u>Bivens</u> remedies are available in other contexts as well, including for

16

violations of the Due Process Clause, <u>Davis v. Passman</u>, 442 U.S. 228 (1979), and for

Eighth Amendment violations by prison officials, <u>Carlson v. Green</u>, 446 U.S. 14

(1980).  However, although the Supreme Court has indicated that federal courts may,

under appropriate circumstances, be empowered to craft non-statutory remedies under

<u>Bivens</u>, they must be careful in doing so.  Indeed, the Supreme Court has made clear

that any extension of <u>Bivens</u> to newly claimed constitutional violations should be

done cautiously:

> [W]e have also held that any freestanding damages remedy
> for a claimed constitutional violation has to represent a
> judgment about the best way to implement a constitutional
> guarantee; it is not an automatic entitlement no matter what
> other means there may be to vindicate a protected interest,
> and in most instances we have found a <u>Bivens</u> remedy
> unjustified.  We have accordingly held against applying the
> <u>Bivens</u> model to claims of First Amendment violations by
> federal employers, <u>Bush v. Lucas</u>, 462 U.S. 296, 103 S. Ct.
> 2362, 76 L.Ed.2d 586 (1983), and wrongful denials of
> Social Security disability benefits, <u>Schweiker v. Chilicky</u>,
> 487 U.S. 412, 108 S.Ct. 2460, 101 L.Ed.2d 370 (1988). We
> have seen no case for extending <u>Bivens</u> to claims against
> federal agencies, <u>FDIC v. Meyer</u>, 510 U.S. 471, 114 S.Ct.
> 996, 127 L.Ed.2d 308 (1994), or against private prisons,
> <u>Correctional Services Corp. v. Malesko</u>, 534 U.S. 61, 122
> S.Ct. 515, 151 L.Ed.2d 456 (2001).

<u>Wilkie v. Robbins</u>, 551 U.S. 537, 550 (2007).  In accordance with this cautious

approach, the Supreme Court has instructed that consideration of a <u>Bivens</u> request

17

necessitates a two-part inquiry:  (1) whether there is any alternative, existing process for protecting the plaintiff's constitutional rights, and which gives the court a "convincing reason" to  refrain from providing a new and freestanding remedy in damages; and (2) even if there is no such alternative, whether there are "special factors" that indicate that a court should not recognize a cause of action.  Id.

Special care is needed when considering invitations to expand the reach of Bivens actions, because "[e]xamining the availability of a Bivens remedy at a 'high level of generality' would 'invite claims in every sphere of legitimate governmental action' touching, however tangentially, on a constitutionally protected interest." Mirmehdi v. United States, 689 F.3d 975, 981 (9th Cir. 2012), cert. denied, 133 S. Ct. 2336 (2013), (quoting Wilkie, 551 U.S. at 561).  In part for this reason, "implied causes of action" under Bivens are "disfavored."  Ashcroft v. Iqbal, 556 U.S. 662, 675 (2009); see also Minneci v. Pollard, 132 S. Ct. 617, 622-23 (2012) (reviewing the Court's thirty-year history of declining to create a Bivens remedy in most cases).

Accordingly, in this case, we must , therefore, construe narrowly the scope of the remedy that the plaintiff urges the Court to recognize, and do so through the specific factual prism that the plaintiff's claims present.  In order to determine the appropriate context to consider Ramirez's claims, therefore, we may "construe the word 'context' as it is commonly used in law: to reflect a potentially recurring

18

scenario that has similar legal and factual components." <u>Mirmehdi</u>, 689 F.3d at 981 (quoting <u>Arar v. Ashcroft</u>, 585 F.3d 559, 572 (2d Cir. 2009) (en banc)).  In <u>Mirmehdi</u>, the Ninth Circuit Court of Appeals held that "[d]eportation proceedings are such a context, unique from other situations where an unlawful detention may arise." <u>Id.</u> The court also noted that immigrants' remedies for vindicating the rights that they enjoy under the Constitution are "not co-extensive with those offered to citizens," <u>id.</u> (citing <u>Reno v. Am.-Arab Anti-Discrimination Comm.</u>, 525 U.S. 471, 488 (1999) ("As a general matter . . .  an alien unlawfully in this country has no constitutional right to assert selective enforcement as a defense against his deportation.").  Accordingly, the Ninth Circuit found that "deportation proceedings constitute the relevant 'environment of fact and law' in which 'to decide whether to recognize a <u>Bivens</u> remedy." <u>Mirmehdi</u>, 689 F.3 at 981 (quoting <u>Arar</u>, 585 F.3d at 572).  We agree that the context presented in this case and in <u>Mirmehdi</u> involve efforts by plaintiffs to assert <u>Bivens</u> claims for allegedly unlawful conduct directly related to the plaintiffs' ongoing removal proceedings.  Carefully focused in this specific context, we consider whether the Court should imply a <u>Bivens</u> remedy for the plaintiff's claims of Due Process, Equal Protection, and Eighth Amendment violations.

We begin by considering the first prong in the Supreme Court's test announced in <u>Wilkie</u>, namely, by considering whether there is any alternative process that could

protect Ramirez's constitutional rights, and which give the Court a "convincing reason" to bar review. Wilkie, 551 U.S. at 550. "If there is such an alternative remedy, our inquiry stops." Mirmehdi, 689 F.3d at 982.

The plaintiff's claims are grounded in allegations that the four named defendants reported that the plaintiff had informed them or other immigration officials that he had previously been affiliated with a particular violent gang, MS-13. He also complains that they included this and other false information in his records that ultimately was used as a basis to continue his detention pending review by the BIA. Ramirez also suggests that by labeling him as a former member of a notorious gang, the defendants potentially put him in danger of being attacked while in custody. At bottom, however, Ramirez is claiming that the defendants included false information in his file in order to continue his pre-removal custody, while ICE appealed the immigration judge's initial ruling that found Ramirez removable, but not deportable to El Salvador. Ramirez's claims, therefore, relate directly to his ongoing detention, and involve matters that were directly relevant to decisions that immigration officials would have had to rely on in deciding whether or not to keep him in custody during the pendency of those immigration proceedings.

The defendants first argue that the plaintiff had a well-established alternative legal process to obtain an effective remedy: *habeas corpus*. Indeed, the defendants

note that prior to initiating this civil action, Ramirez was prosecuting a petition for *habeas* relief relating to the very detention that he complains about in this case.  In those *habeas* proceedings, Ramirez argued that his detention since September 30, 2011, which ICE commenced after reinstating a prior order of removal against him, was unconstitutionally excessive.  See Ramirez-Alvarez v. Decker, No. 1:12-CV-2126 (M.D. Pa.).

The United States Court of Appeals has recognized that "special factors counsel[] hesitation in finding a Bivens claim [when a plaintiff] has an effective remedy available through *habeas corpus*."  Wilson v. Rackmill, 878 F.2d 772, 775 (3d Cir. 1989) (civil rights lawsuit challenging alleged conspiracy to have plaintiff arrested and continued in custody).[3]  Likewise, the United States Court of Appeals for the Eleventh Circuit declined to find a Bivens remedy available for a plaintiff who sued a parole officer for alleged misrepresentations, holding that the existence of the

---

[3] In Wilson, the Third Circuit was considering an appeal brought by a plaintiff after his federal lawsuit was dismissed as frivolous pursuant to 28 U.S.C. § 1915(d).  The appeals court found that the claims were not frivolous, and, therefore, reversed the district court's order dismissing the suit.  However, in making this finding, the court observed that it was "arguable whether appellant has stated a cause of action under Bivens."  The court noted that there may ultimately be factors that counseled hesitation in finding a Bivens remedy in this type of case if the appellant had an effective remedy available through *habeas*.  The court further suggested that although the claims were not legally meritless under 28 U.S.C. § 1915(d), it may be that the claims could eventually "suffer dismissal under Rule 12(b)(6)."  878 F.2d at 775.

*habeas corpus* and parole statutes provided the plaintiff with adequate forms of relief, and, therefore, constituted "special factors counseling hesitation" against recognizing a separate <u>Bivens</u> remedy for damages.  <u>Rauschenberg v. Williamson</u>, 785 F.2d 985, 987-88 (11th Cir. 1986).   More recently, and on even more compelling facts involving claims brought by immigrants in deportation proceedings, the Ninth Circuit refused to imply a <u>Bivens</u> remedy where the plaintiffs attempted to challenge their immigration detention through two different procedural vehicles:  a *habeas corpus* petition and the ongoing removal proceedings themselves.  <u>Mirmehdi</u>, 689 F.3d at 982.  The availability of these two remedies inspired the Ninth Circuit to observe:

> The Mirmehdis could – and did – challenge their detention through not one but two different remedial systems.  As the Second Circuit stated:   "Congress has established a substantial, comprehensive, and intricate remedial scheme in the context of immigration."  <u>Arar</u>, 585 F.3d at 572.  The availability of habeas is another remedy.  <u>See</u> <u>Rauschenberg v. Williamson</u>, 785 F.2d 985, 987-88 (11th Cir. 1986).  The Mirhmehdis took full advantage of both.

<u>Id.</u>  This is precisely what Ramirez endeavored to do in this case, and the Ninth Circuit's persuasive reasoning is entirely applicable to the analogous facts of Ramirez's case.  Ramirez had opportunity to challenge his ongoing detention, which he claims was based at least in part on factually inaccurate and potentially damaging information about his prior criminal history and gang affiliations – information that

Ramirez claims was false and intended to injure him.  Ramirez not only had the potential to take advantage of other procedural vehicles to challenge his detention and the information on which it was allegedly based, he did so.  The availability of these remedial systems causes us to find that an additional <u>Bivens</u> remedy is not warranted in this particular context.

Although Ramirez has failed to offer any compelling legal opposition to the defendants' arguments, in other cases parties have argued – and courts have sometimes agreed – that the unavailability of damages as a remedy may sometimes provide support for finding a <u>Bivens</u> remedy available.  Thus, in <u>Diaz-Bernal v. Myers</u>, 758 F. Supp. 2d 106 (D. Conn. 2010), the district court considered whether a <u>Bivens</u> remedy was available to aliens who were subjected to an early-morning immigration raid, and who brought claims for Fourth and Fifth Amendment violations arising out of that raid.  In that case, as here, the defendants argued that the court should decline to recognize a <u>Bivens</u> action for the plaintiffs, relying in part on the fact that the INA contains a comprehensive scheme governing the appeal of removal proceedings and discretionary decisions made by the Attorney General in the immigration context.  The district court acknowledged that the INA was comprehensive, but noted that it "does *not* provide a remedial scheme for violations committed by immigration officials outside of removal proceedings."  <u>Id.</u>  at 128.

(emphasis added).  Accordingly, the court determined that "[i]f a Bivens remedy were precluded, the present plaintiffs would have no forum in which to seek a remedy for the defendants' alleged constitutional violations." Id. at 128-29.  Having drawn this distinction, the court found that there was "no alternative remedial scheme," id. at 129, and thus found that the first prong of Wilkie did not counsel against finding a Bivens remedy.

More recently, in De La Paz v. Coy, 954 F. Supp. 2d 532 (W.D. Tex. 2013), the district court considered whether to recognize a Bivens cause of action in a case brought by an alien who claimed he was wrongly stopped and arrested by border patrol agents, and was later placed into removal proceedings.  The defendants in that case, relying on Mirmehdi, argued, inter alia, that the plaintiff should not be able to resort to Bivens because he could protect his interests through his pending removal proceeding.  The court found Mirmehdi distinguishable because the Ninth Circuit was considering only whether to "extend Bivens in order for illegal immigrants to recover for unlawful detention during deportation proceedings."  Id. at 542 (quoting Mirmehdi, 689 F.3d at 981).  The district court noted that De La Paz had not brought a claim for unlawful detention, but instead claims for constitutional violations that preceded the initiation of deportation proceedings.  Id.  Furthermore, the court observed that unlike the plaintiffs in Mirmehdi, De La Paz had not exercised any

alternative remedies, even assuming they were actually available to him as part of his removal proceedings.  For these reasons, the court declined to follow <u>Mirmehdi</u>, and allowed the plaintiff to bring a <u>Bivens</u> claim for unlawful seizure.

Upon consideration, we believe that the reasoning of <u>Mirmehdi</u>, and the similar analysis offered by the Eleventh Circuit in <u>Rauschenberg v. Williamson</u>, 785 F.2d 985, 987-88 (11th Cir. 1986) support a finding that a <u>Bivens</u> remedy should not be implied in Ramirez's case.  Furthermore, the reasoning employed by the courts in <u>Diaz-Bernal</u> and <u>De La Paz</u> is distinguishable, as these cases involved constitutional claims for incidents that occurred prior to the initiation of removal proceedings, and it is questionable whether there existed adequate alternative procedures to remedy the claimed violations in those cases.  In contrast, Ramirez's claims relate directly to his custodial detention pending his removal proceedings – precisely the factual context of <u>Mirmehdi</u>.  Although there may be constitutional violations that are not capable of being remedied through the immigration process, Ramirez's claims were, and Ramirez could  attempt to challenge his ongoing detention through both the removal process and in a parallel proceeding in *habeas*.  The availability of these potential remedies cautions against finding an additional <u>Bivens</u> remedy.

Furthermore, the INA constitutes a "comprehensive federal statutory scheme for regulation of immigration and naturalization."  <u>Chamber of Commerce of U.S. v.</u>

Whiting, 131 S. Ct. 1968, 1973 (2011) (quoting DeCanas v. Bica, 424 U.S. 351, 353 (1976)).  The INA includes specific and detailed provisions governing removal proceedings before an immigration judge, and provides for procedural safeguards for those proceedings.  See, e.g., 8 U.S.C. § 1229a.  The INA also provides specific statutory procedures for the detention of aliens pending deportation, as well as requirements for relief from such detention.  See, e.g., 8 U.S.C. §§ 1225, 1226, and 1231.  The "complexity and comprehensiveness of the existing remedial system is another factor among a broad range of concerns counseling hesitation before allowing a Bivens remedy."  Mirmehdi, 662 F.3d at 1080.

The fact that the INA does not also provide a damages remedy to immigrants challenging their continued detention does not compel a finding that a Bivens remedy should be implied, since the comprehensive nature of the INA's immigration scheme indicates that Congress declined to provide for such relief and further cautions against finding a Bivens remedy in this type of case.  See Mirmehdi, 689 F.3d at 982 ("Congress's failure to include monetary relief can hardly be said to be inadvertent, given that despite multiple changes to the structure of appellate review in the [INA], Congress never created such a remedy.");  D'Alessandro v. Chertoff, No. 10-CV-972A2011, 2011 WL 6148756, at *4 (W.D.N.Y. Dec. 12, 2011) (dismissing Bivens claim arising from allegedly wrongful detention in removal proceedings because the

court would "not craft an additional remedy of money damages that is contemplated nowhere in the immigration statutes and regulations.").[4]

In sum, we agree with the defendants that the Court should not imply a <u>Bivens</u> remedy to the specific facts of this case, which arose within and relate directly to Ramirez's detention pending removal proceedings.   The existence of adequate alternative process to address the claimed violations, the fact that the plaintiff challenged the fact and duration of his custody through *habeas corpus* proceedings and could also have done so in his removal proceedings, and the INA's comprehensive statutory scheme in the field of immigration compel the conclusion that a <u>Bivens</u> remedy should not be recognized for Ramirez's constitutional claims in this case.

### C.   Alternatively, the Defendants are Entitled to Qualified Immunity from Ramirez's Claims

The defendants next argue that even if the Court has subject matter jurisdiction over some or all of the claims, and even if the plaintiff has stated a claim upon which relief could potentially be granted, the defendants are nevertheless entitled to

---

[4]This caution is particularly appropriate here since Congress has created a statutory scheme under the INA which intentionally limits the role of the district court in substantively assessing ALJ proceedings. It would be a curious thing to imply a far-reaching right in the context of <u>Bivens</u> lawsuits to challenge these immigration proceedings and decisions in the face of a specific judgment by Congress to explicitly limit our role in this legal process.

qualified immunity from the plaintiff's claims relating to information that the individual defendants included, or simply repeated, in their reports regarding the plaintiff's criminal history, gang affiliations, and other matters relevant to ICE's decision about whether to keep Ramirez in custody pending his removal proceedings.

The doctrine of qualified immunity shields government officials "from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." Harlow v. Fitzgerald, 457 U.S. 800, 818 (1982); see also Bistrian v. Levi, FDC, 696 F.3d 352, 366 (3d Cir. 2012). The doctrine protects public officials "from undue interference with their duties and from potentially disabling threats of liability." Wright v. City of Philadelphia, 409 F.3d 595, 599 (3d Cir. 2005). In accordance with this doctrine, government officials will be immune from suit in their individual capacities unless, "taken in the light most favorable to the party asserting the injury, . . . the facts alleged show the officer's conduct violated a constitutional right" and "the right was clearly established" at the time of the objectionable conduct. Saucier v. Katz, 533 U.S. 194, 201 (2001). Courts may exercise their discretion in deciding which of the two prongs of the qualified immunity analysis should be addressed first in consideration of the circumstances presented by the particular case at hand. Pearson v. Callahan, 555 U.S. 223, 129 S. Ct. 808, 818 (2009).

"The relevant dispositive inquiry in determining whether a right is clearly established is whether it would be clear to a reasonable officer that his conduct was unlawful in the situation he confronted." Saucier, 533 U.S. at 202.  This inquiry "must be undertaken in light of the specific context of the case."  Id. at 201.  Accordingly, "to decide whether a right was clearly established, a court must consider the state of the existing law at the time of the alleged violation and the circumstances confronting the officer to determine whether a reasonable state actor could have believed his conduct was lawful." Kelly v. Borough of Carlisle, 622 F.3d 248, 253 (3d Cir. 2010).

Ramirez's claims are essentially that the defendants' inclusion of information in his custody records regarding his past gang affiliations and criminal history – some of which Ramirez purports to dispute – amount to a violation of his constitutional rights.  Ramirez endeavors to articulate claims for under both the Fifth and Eighth Amendments to the Constitution, but he has failed adequately to plead injury under either of these constitutional provisions.  Thus, Ramirez claims that the defendants' conduct violated his right to substantive and procedural due process, and equal protection, guaranteed by the Fifth Amendment to the Constitution.  We consider each of these claims below.

The Fifth Amendment provides that "[n]o person . . . shall be deprived of life, liberty, or property, without due process of law." U.S. Const. am. V. The Fifth Amendment applies to all "persons" within the United States, and thus it encompasses removable aliens like Ramirez. See Landon v. Plasencia, 459 U.S. 21, 32-33 (1982); see also United States v. Balsys, 524 U.S. 666, 671 (1998) ("Resident aliens . . . are considered 'persons' for purposes of the Fifth Amendment and are entitled to the same protections under the [Self-Incrimination] Clause as citizens."); Chi Thon Ngo v. I.N.S., 192 F.3d 390, 396 (3d Cir. 1999) ("Even an excludable alien is a "person" for purposes of the Fifth Amendment and is thus entitled to substantive due process.").

Substantive due process under the Fifth Amendment forbids the government from infringing upon certain "fundamental" liberty interests at all, "no matter what process is provided, unless the infringement is narrowly tailored to serve a compelling state interest." Reno v. Flores, 507 U.S. 292, 302 (1993). Substantive due process "prevents the government from engaging in conduct that shocks the conscience . . . or interferes with the rights implicit in the concept of ordered liberty." United States v. Salerno, 481 U.S. 739, 746 (1987) (internal citations omitted). The Supreme Court has observed that "[f]reedom from imprisonment – from government custody, detention, or other forms of physical restraint – lies at the heart of the liberty

30

that Clause protects." Zadvydas v. Davis, 533 U.S. 678, 690 (2001). Government detention violates the Due Process Clause unless it is ordered in a criminal proceeding with adequate procedural protections, or in non-punitive circumstances "where a special justification . . . outweighs the individual's constitutionally protected interest in avoiding physical restraint." Id. at 690. It is well-settled that "detention during deportation proceedings [is] a constitutionally valid aspect of the deportation process" since deportation proceedings "would be vain if those accused could not be held in custody pending the inquiry into their true character." Demore v. Kim, 538 U.S. 510, 523 (2003) (quoting Wong Wing v. United States, 163 U.S. 228, 235 (1896)).

Although there may be circumstances where an alien lawfully detained during deportation proceedings may nonetheless have due process protections against unlawfully protracted detention or under circumstances give rise to special concern, see generally Zadvydas and Demore, supra, these sort of circumstances are not implicated in the instant action. In this case, Ramirez asserts a due process right based on a bare allegation that four ICE officers included information in his custody records about his past admission to gang affiliation.

Ramirez claims this information was untrue or fabricated, but we do not agree that this threadbare allegation is sufficient even to state a substantive due process

claim.  The plaintiff has alleged, and the exhibits attached to his complaint indicate, that ICE officials articulated multiple objective facts – in addition to a statement of Ramirez's history of gang affiliation – that recommended continued detention pending ICE's appeal of the immigration judge's initial removal decision in 2012.  These factors included the fact that Ramirez has six criminal convictions, including resisting a police officer and robbery, as well as arrests for multiple violent offenses including assault, threats with the intent to terrorize, and murder.  (Compl., Ex. 5, Review for Release)

Moreover, the information in the ICE review provided objective facts showing that Ramirez would be a flight risk if he was released because he lacked sufficient familial ties in the United States and, perhaps most tellingly, because he had previously demonstrated a pattern of non-compliance with law enforcement authorities.  The inclusion of information about Ramirez's affiliation with gangs – regardless of which gangs – does not violate Ramirez's substantive due process rights, and certainly cannot reasonably be construed as a violation of Ramirez's due process rights when the ICE custody review was based on a myriad of other objective factors that strongly supported continued detention of a convicted felon with multiple contacts with law enforcement, who had engaged in violent conduct, and who had persistently violated this country's immigration laws.

With respect to Ramirez's claim that the defendants somehow placed him at a risk of "extreme harm" to his "liberty, health, and safety interests" by including statements in his custody records about MS-13 membership, Ramirez never alleges that this information was disseminated to or otherwise shared with any other member of the detainee population, and thus we agree with the defendants that Ramirez has not adequately alleged that he was actually placed in danger.  Ramirez does not allege or offer any suggestion that other detainees knew about ICE's belief that Ramirez was at one time affiliated with MS-13.

To the extent that Ramirez is attempting to allege an equal protection violation under the Fifth Amendment relating his having been identified as a former member of MS-13, and the defendants failure to correct these records, we find that this claim also fails to plead a constitutional violation.  In order to state an equal protection claim, a plaintiff must show that he "has been treated differently from persons who are similarly situated."  Renshenski v. Williams, 622 F.3d 315, 337 (3d Cir. 2010) (citing Williams v. Morton, 343 F.3d 212, 221 (3d Cir. 2003)).  Nothing in Ramirez's complaint is sufficient to support an equal protection claim, as Ramirez does not allege that the defendants treated him differently from similarly situated persons, or acted with any discriminatory purpose.  As Ramirez has not even articulated a

plausible equal protection claim in the first place, the defendants are entitled to qualified immunity from this claim as well.

Finally, Ramirez has endeavored to bring a claim that his right to procedural due process guaranteed by the Fifth Amendment was violated due to alleged bias that Ramirez claims is "inherent" the ICE custody review process, and because the defendants allegedly failed to "meaningfully and impartially review" his custody status.  Essentially, in order to state a procedural due process claim, Ramirez simply repackages his allegations about the defendants' allegedly erroneous report about his prior gang affiliation, their failure to correct these records, and their failure to act favorably on his request for corrective action.  (Compl. ¶¶ 10, 14, 15.)

It is well-settled that the Fifth Amendment entitles aliens to due process of law in the context of deportation proceedings.  Reno, 507 U.S. at 306.  In order to state a claim for procedural due process, a plaintiff must show that the government deprived him of a liberty or property interest without providing notice or meaningful opportunity to be heard.  In the context of the detention of aliens subject to removal proceedings, where due process is required, ICE officials are enjoined to evaluate the individual's threat to the community and his risk of flight.  Chi Thon Ngo, 192 F.3d at 398.  In this case, it appears from the allegations in the complaint, and in the exhibits attached thereto, that this is precisely what occurred in this case.

The fact that Ramirez disagreed with the outcome of ICE's custody review pending the appeal to the BIA does not articulate a claim that his procedural due process rights were violated; to the contrary, Ramirez has alleged, and the attached exhibits that show ICE officials considered multiple factors in deciding that Ramirez presented both a risk of flight and a danger to the community, and, therefore, decided to keep him in custody pending appeal.   Ramirez's bald allegation that the ICE custody review process is itself inherently biased, or that ICE officials intentionally labeled him as an MS-13 member in order to continue his custody is conclusory, unsupported, and substantially contradicted by other allegations in the complaint and the ICE custody documents themselves, which Ramirez relies upon.

Additionally, we do not find that Ramirez has plausibly alleged a due process violation based upon the alleged failure of unidentified ICE personnel to correct his records regarding past gang affiliation.  Even if Ramirez did submit a letter requesting such relief, he does not allege that this letter was sent to any of the named defendants, or that any of these defendants did anything to impede any correction to his records. In short, even assuming Ramirez could assert a claim based upon the failure of ICE officials to respond to his letter, he does not and cannot attribute this failure to any of the named defendants in this case.  Thus, Ramirez has not alleged any facts to show that the named defendants had any personal involvement in the failure of other,

unspecified individuals to respond to Ramirez's request in a manner he deemed satisfactory.

Lastly, Ramirez has not articulated a claim that he was subjected to cruel and unusual punishment based upon the allegation that ICE officials identified him as a former MS-13 member.   The Eighth Amendment protects prisoners from the imposition of cruel and unusual punishment. Farmer v. Brennan, 511 U.S. 825, 834 (1994).  The conditions of pre-trial detainees, however, are analyzed under the Due Process Clause of the Fifth Amendment, not the Eighth Amendment as alleged in the complaint.  Bell v. Wolfish, 441 U.S. 520, 535 (1979); Hubbard v. Taylor, 399 F.3d 150, 158 (3d Cir. 2005).  In order to prevail on such a claim, a detainee must show that the allegedly unlawful conditions of confinement amount to punishment.  Id.  An immigration detainee like Ramirez is entitled to the same protections as pre-trial detainees.  Latansio v. Sabol, No. 4:10-CV-0582, 2010 WL 4340394, at *4 (M.D. Pa. Oct. 26, 2010).   The relevant inquiry is whether the defendants' actions were undertaken "for the purpose of punishment" or were otherwise "incident[s] of some other legitimate purpose."  Hubbard, 399 F.3d at 158 (citing Bell, 441 U.S. at 538-39).

Even read liberally, the complaint fails to articulate in any plausible way that the defendants' statements about his MS-13 membership included in some of his

custody records constitutes "punishment."  This information was set forth against numerous other relevant factors that ICE officials were considering in deciding whether to retain custody over Ramirez pending an appeal of the immigration judge's initial order withholding Ramirez's removal.

Ramirez makes no allegations to support the bare assertion that ICE officials intentionally ignored risks that put him at a risk of danger while he was detained at the York County Prison.  Likewise, he has not offered anything other than the spare assertion that ICE's statement about his gang affiliation caused him severe mental suffering, and the information he has provided from a treating Clinical Psychologist is unhelpful because it pre-dates the ICE custody review, and does not include any diagnosis.  (Compl. ¶¶ 10, 17, Ex. 3)  Whereas the detention documents that ICE officials relied upon contain numerous factors relevant to a custody determination, and appear clearly to be "incident of some other legitimate purpose[s]" – such as determining whether Ramirez presented a risk of flight of danger to the community if released – they do not appear to have been prepared or considered for the unlawful purpose of punishing Ramirez.

Yet, even if Ramirez had plausibly alleged that the defendants' actions amounted to violations of his constitutional rights, the defendants would still be entitled to qualified immunity because Ramirez has not shown that the defendants'

actions violated his clearly established rights.  In order for a right to be clearly established for purposes of qualified immunity, "there must be sufficient precedent at the time of the action, factually similar to the plaintiff's allegations, to put [the] defendant on notice that his or her conduct is constitutionally prohibited."  McKee v. Hart, 436 F.3d 165, 171 (3d Cir. 2006) (quoting McLaughlin v. Watson, 271 F.3d 566, 572 (3d Cir. 2001)) (alterations in McKee).  This inquiry is objective and is independent of any subjective beliefs of the defendants.  Bartholomew v. Pa., 221 F.3d 425, 428 (3d Cir. 2000).  In short, a defendant is entitled to qualified immunity if "reasonable officials in [his] position at the relevant time could have believed, in light of what was in the decided case law, that their conduct would be lawful."  In re City of Phila. Litig., 49 F.3d 945, 962 n.14 (3d Cir. 1995).  In order "to decide whether a right was clearly established, a court must consider the state of the existing law at the time of the alleged violation and the circumstances confronting the officer to determine whether a reasonable state actor could have believed his conduct was lawful."  Kelly v. Borough of Carlisle, 622 F.3d 248, 253 (3d Cir. 2010).  The doctrine is specifically intended to protect officials who may make mistaken judgments, while allowing claims to go forward against officials who are "plainly incompetent" or those "who knowingly violate the law."  Gilles v. Davis, 427 F.3d 197, 203 (3d Cir. 2005).  Applying these benchmarks, court have extended qualified

immunity to immigration officials' detention decisions, where those decisions did not

the violate clearly established constitutional rights of the immigration detainee.  See

Kwai Fun Wong v. United States, 373 F.3d 952, 956 (9th Cir. 2004); Joseph v.

Ashcroft, CIV.A. 01-2679, 2002 WL 1832820 (E.D. Pa. Aug. 5, 2002)

In this case, the defendants' recommendations and ultimate decision to

continue Ramirez's detention pending ICE's appeal to the BIA were based upon

multiple factors, all of which were relevant to a decision about Ramirez's potential

danger to the community and the risk that he would flee.  Only one of these numerous

factors was the fact that ICE believed Ramirez at one time admitted to being a

member of MS-13.  Nothing in the complaint or the documents attached thereto

suggest that it was unreasonable or plainly erroneous for the defendants to have

included this information, but more importantly it is clear that the decision regarding

Ramirez's custody was reasonably based upon a consideration of many factors,

including among others Ramirez's past propensity for engaging in violent criminal

conduct, his disregard of law enforcement and judicial orders, and his lack of familial

ties to the United States.  The decision regarding Ramirez's continued custody,

therefore, appear from the complaint itself to be objectively reasonable.

Finally, there is substantial indication in the record that Ramirez had at one

time admitted to gang affiliation, and the immigration judge decided to withhold

Ramirez's removal to El Salvador precisely because it would likely appear to Salvadoran officials that Ramirez was a gang member and would, therefore, face persecution or violence.   Ramirez's own Clinical Psychologist noted that he had grown up in an area infested with gang activity, and that he bore tattoos that she found to be "indicative of gang affiliation".   Ramirez admitted to numerous authorities that he had interacted with gang members, and may have been a reluctant gang member himself.   Given this indicia in the record, the defendants' statements about Ramirez's gang affiliation were objectively reasonable, and thus the defendants are entitled to qualified immunity for this reason as well.

Indeed, when considering this qualified immunity question, we are constrained to note that this Court has in the context of habeas corpus petitions filed by the plaintiff twice considered whether Ramirez's detention was legally justified, and has twice concluded that this detention was for the most part constitutionally permissible given Ramirez-Alvarez's persistent refusal to obey immigration orders and his history of violating bail conditions in the past.  See Ramirez-Alvarez v. Holder, 1:11-CV-2098, 2011 WL 7080657 (M.D. Pa. Dec. 14, 2011) report and recommendation adopted, 1:11-CV-2098, 2012 WL 194173 (M.D. Pa. Jan. 23, 2012); Ramirez-Alvarez v. Decker, 1:12-CV-2126, Doc. 46 (December 16, 2013).   Given these rulings, it simply cannot be said that immigration officials would have recognized

that their decision to detain Ramirez–which had been upheld by the courts– would violate clearly established law.

## V.   **RECOMMENDATION**

For all of the foregoing reasons, IT IS HEREBY RECOMMENDED THAT the defendants' motion to dismiss the plaintiff's complaint be GRANTED with prejudice.

The parties are further placed on notice that pursuant to Local Rule 72.3:

> Any party may object to a magistrate judge's proposed findings, recommendations or report addressing a motion or matter described in 28 U.S.C. § 636 (b)(1)(B) or making a recommendation for the disposition of a prisoner case or a habeas corpus petition within fourteen (14) days after being served with a copy thereof. Such party shall file with the clerk of court, and serve on the magistrate judge and all parties, written objections which shall specifically identify the portions of the proposed findings, recommendations or report to which objection is made and the basis for such objections. The briefing requirements set forth in Local Rule 72.2 shall apply. A judge shall make a de novo determination of those portions of the report or specified proposed findings or recommendations to which objection is made and may accept, reject, or modify, in whole or in part, the findings or recommendations made by the magistrate judge. The judge, however, need conduct a new hearing only in his or her discretion or where required by law, and may consider the record developed before the magistrate judge, making his or her own determination on the basis of that record. The judge may also receive further evidence, recall witnesses or recommit the matter to the magistrate judge with instructions.

/s/ *Martin C. Carlson*
Martin C. Carlson
United States Magistrate Judge

Dated: March 20, 2014